UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.

JASON LEVASSEUR

No. 1:22-cr-00155-LEW

GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS INDICTMENT

The United States of America opposes Jason Levasseur's Motion to Dismiss (Dkt. 26). Levasseur argues that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). For the reasons set forth below, the Motion should be denied.

STATEMENT OF THE CASE

I.  STATUTORY BACKGROUND

Federal law has long restricted the shipment, transport, possession, and receipt of firearms and ammunition by certain categories of individuals. One such disqualification is 18 U.S.C. § 922(g)(1), which generally prohibits the possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." Section 922(g)(1) reflects Congress's longstanding recognition that the "ease with which" firearms could otherwise be acquired by "criminals[] . . . and others whose possession of firearms is similarly contrary to the public interest" is "a matter of serious national concern." S. Rep. No. 90-1097, at 28 (1968); *see* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, sec. 2, 75 Stat. 757, 757 (1961) (prohibiting those who have been convicted of a "crime punishable by imprisonment for a term exceeding one year" from shipping,

transporting, or receiving firearms); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. VII, sec. 1202(a)(1), 82 Stat. 197, 236 (adding prohibition on possession).

Congress has explained that "it is not the purpose" of this or similar provisions of federal law "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens." Omnibus Crime Control and Safe Streets Act of 1968, tit. IV, sec. 901(b), 82 Stat. at 226; Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, sec. 101, 82 Stat. 1213, 1213-14. A conviction is not disqualifying for purposes of Section 922(g)(1) if it was for a "State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). Also excluded is "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored." *Id.* § 921(a)(20). And there is an additional exclusion for "Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." *Id.* § 921(a)(20)(A).

## II. FACTUAL BACKGROUND

Levasseur has been charged in a one-count indictment as a felon in possession of a firearm, in violation of Title 18 U.S.C. § 922(g)(1). (Dkt. 1). His prior felony convictions include the following:

- Illegal Possession of a Firearm in violation of Title 15, Maine Revised Statutes, Section 393(1)(A-1); said conviction and sentence entered on about May 3, 2022, in Washington County Unified Criminal Docket number WASCD-CR-2019-20246;

- Illegal Possession of a Firearm in violation Title 15, Maine Revised Statutes, Section 393(1)(A-1); said conviction and sentence entered on about July 6, 2022, in Penobscot County Unified Criminal Docket number PENCD-CR-2021-3172;

- Illegal Possession of a Firearm in violation of Title 15, Maine Revised Statutes, Section 393(1)(A-1); said conviction and sentence entered on about July 6, 2022, in Penobscot County Unified Criminal Docket number PENCD-CR-2022-0007;

- Operating After Habitual Offender Revocation, 1 Prior, in violation of Title 29-A, Maine Revised Statutes, Section 2557-A(1)(A); said conviction and sentence entered on about July 6, 2022, in Penobscot County Unified Criminal Docket number PENCD-CR-2022-0007;

- Unlawful Possession of Scheduled Drugs, in violation of Title 17-A, Maine Revised Statutes, Section 1107-A(1)(B)(7); said conviction and sentence entered on about July 6, 2022, in Penobscot County Unified Criminal Docket number PENCD-CR-2022-0007; and

- Violation of Condition of Release, in violation of Title 15, Maine Revised Statutes, Section 1092(1)(B); said conviction and sentence entered on about July 6, 2022, in Penobscot County Unified Criminal Docket number PENCD-CR-2022-0007.

Id.

3

**DISCUSSION**

## I.  TITLE 18, UNITED STATES CODE, SECTION 922(g)(1) DOES NOT VIOLATE THE SECOND AMENDMENT AS APPLIED TO LEVASSEUR.[1]

### A.  Section 922(g)(1) Is Not Subject To As-Applied Challenges.

The Constitution protects an individual right to keep and bear arms, but, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Thus, a "variety" of firearm regulations are consistent with the Second Amendment. *Id.* at 636; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring). In recognizing an individual right to bear arms, the Supreme Court in *Heller* cautioned that "nothing in [the Court's] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. And in *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" the "assurances" that *Heller's* holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. 742, 786 (2010) (*quoting Heller*, 554 U.S. at 626).

The First Circuit subsequently rejected a challenge to Section 922(g)(1) in *United States v. Torres-Rosario*, recognizing the Supreme Court's clear statements that its Second Amendment jurisprudence in *Heller and McDonald* "did not cast doubt on such longstanding regulatory measures as prohibition on the possession of firearms by felons." 658 F.3d 110, 112-13 (1st Cir. 2011) (*quoting McDonald*, 130 S. Ct. at 3047), *cert. denied,* 565 U.S. 1271 (2012); *see also United States v. Booker*, 644 F.3d 12, 22-23 (1st

---

[1] Many of the arguments raised by Levasseur were recently rejected in United States v. Dario Giambro, Docket No. 2:22-cr-000440GZS, 2023 WL 3727673 (D. Maine May 30, 2023).

Cir. 2011) (upholding Section 922(g)(9) against constitutional challenge as "fit[ting] comfortably among the categories of regulations that *Heller* suggested would be 'presumptively lawful'"); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (upholding Section 922(x)(2)(A)).

The First Circuit noted that "[a]ll of the circuits to face the issue post *Heller* have rejected blanket challenges to felon in possession laws." *Torres-Rosario*, 658 F.3d at 113 (collecting post-*Heller*, pre-*Bruen* cases). The majority of circuits to address the issue post-*Heller* have also concluded that Section 922(g)(1)'s felon-possession prohibition is not subject to as-applied challenges. *See, e.g., In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished) (explaining that Tenth Circuit has "rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)"); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Scroggins,* 599 F.3d 433, 451 (5th Cir. 2010) (after *Heller*, the Fifth Circuit "reaffirmed [its] prior jurisprudence" holding that "criminal prohibitions on felons (violent or nonviolent) possessing firearms did not violate" the Second Amendment); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam) (holding that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment"), *cert. denied*, 560 U.S. 958 (2010); *accord Hamilton v. Pallozzi*, 848 F.3d 614, 625-27 (4th Cir. 2017) ("hold[ing] that a challenger convicted of a state law felony generally cannot satisfy step one" of the then-prevailing framework and concluding that "[a] felon cannot be returned to the category of 'law-abiding, responsible citizens' for the purposes of the Second Amendment and so cannot succeed at step one of the [then-prevailing framework] unless the felony conviction is

pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful."); *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012) (concluding felon defendant "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of the 'right of *law-abiding responsible* citizens to use arms in defense of hearth and home.'" (*quoting Heller*, 554 U.S. at 635) (emphasis in original)); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) ("felons are categorically different from the individuals who have a fundamental right to bear arms"); *United States v. Torres,* 789 F. App'x. 655, 656-67 (9th Cir. 2020) (Mem.); *Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018) (observing that Sixth Circuit has "upheld § 922(g)(1), which disarms even non-violent felons"). Indeed, "no circuit" has ever "held [18 U.S.C. § 922(g)(1)] unconstitutional as applied" to an individual convicted of an offense labeled a felony. *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019) (rejecting as-applied challenge by individual convicted of felony fraud).[2]

The First Circuit has not yet had occasion to expressly foreclose the possibility of—or permit—as-applied challenges to Section 922(g)(1). It observed in *Torres-Rosario* that "[i]t is well-established that felons are more likely to commit violent crimes than are other law-abiding citizens." 658 F.3d at 113 (*quoting United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011)). The First Circuit concluded that, "[a]ssuming *arguendo*

---

[2]    Some courts of appeals before *Bruen* left open the theoretical possibility of a successful as-applied challenge to Section 922(g)(1). *See, e.g.*, *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016); *United States v. Williams*, 616 F.3d 685, 693-94 (7th Cir. 2010). However, the only court of appeals decision holding the statute unconstitutional in any of its applications is *Binderup*, where a narrow majority of the en banc Third Circuit held Section 922(g)(1) unconstitutional as applied to two state-law misdemeanants. 836 F.3d at 356-57.

that the Supreme Court might find some felonies so tame and technical as to be insufficient to justify the ban," the defendant's prior convictions for serious drug offenses were "not likely to be among them." *Id.* It therefore avoided deciding whether an as-applied challenge is possible, only assuming that the *Heller* Court's description of "such longstanding bans as 'presumptively lawful' . . . at most . . . reserves the possibility of yet to be developed qualifications." *Id.* (*quoting Heller*, 554 U.S. at 627 n.26). It supposed that "the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban. Possibly it might even be open to highly fact-specific objections." *Id.*

However, the First Circuit also expressed deep skepticism of as-applied challenges to Section 922(g)(1) in *Torres-Rosario*. *See Medina v. Sessions,* 279 F. Supp. 3d 281 (D.D.C. 2017); *Kanter v. Barr*, 919 F.3d 437, 443 (7th Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Such a fact-specific approach, it cautioned, "applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." *Torres-Rosario*, 658 F.3d at 113. That skepticism was expressed in a different context in *Booker,* where the First Circuit observed that the oft-quoted passage in *Heller* "'tells us that statutory prohibitions on the possession of weapons by some persons are proper. That is, the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill . . .—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23 (*quoting United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)) (internal modification omitted).

Like the First Circuit, the D.C. Circuit has not yet directly answered "if it is ever possible for a convicted felon to show that he may still count as a 'law-abiding, responsible citizen." *Medina*, 913 F.3d at 160. However, it did conclude that "convicted felons are excluded from the scope of the Second Amendment." *Id.* Similarly, the Eighth Circuit has occasionally rejected defendants' as-applied challenges to Section 922(g)(1). S*ee, e.g., United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) ("To the extent the Eighth Circuit has left open the possibility that a person could bring a successful as-applied challenge to § 922(g)(1), the Eighth Circuit has denied similar claims from defendants with criminal histories similar to Woolsey."). However, that Circuit "has not resolved whether the felon-in-possession statute is susceptible to as-applied challenges . . .." *United States v. Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022).

*Heller* and *McDonald* "did not cast doubt on such longstanding regulatory measures as prohibition on the possession of firearms by felons." *Torres-Rosario,* 658 F.3d at 112-13 (*quoting McDonald*, 130 S. Ct. at 3047). The First Circuit relied upon that language in *Torres-Rosario. Id.* Circuits holding that Section 922(g)(1) is not susceptible to Second Amendment challenges have also relied upon those explicit statements. *See, e.g., McCane,* 573 F.3d at 1047; *In re United States*, 578 F.3d at 1199-1200; *Vongxay*, 594 F.3d at 1115; *Rozier*, 598 F.3d at 771; *Scroggins*, 599 F.3d at 451; *Torres*, 789 F. App'x at 656; *Hamilton*, 848 F.3d at 625-28.

The Supreme Court's statements reflect its recognition that the right to bear arms is limited to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. And since *Heller,* the Supreme Court has twice reaffirmed—first in *McDonald*, then in *Bruen*—that the right to bear arms is limited to law-abiding citizens. Indeed, *Bruen* defines the

8

Second Amendment as belonging to "law-abiding" citizens no fewer than fourteen times. 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n. 8, 2138 & n.9, 2150, 2156. Consistent with that principle, while *Bruen* invalidated New York's "may-issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring). The Court explained that such regimes—many of which prohibit the issuance of licenses to felons—generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (majority op.) (*quoting Heller,* 554 U.S. at 635).[3] That reasoning underscores that Section 922(g)(1), which likewise aims to ensure that "those bearing arms" are "'law-abiding, responsible citizens,'" *id.,* accords with the Second Amendment.

    *Bruen* stressed that it was "reiterat[ing]" *Heller*'s approach, clarifying the legal standard "[i]n keeping with *Heller*," and "apply[ing]" the "test that [the Court] set forth in *Heller*." 142 S. Ct. at 2126, 2129, 2131. Indeed, Justices who joined the Court's decision in *Bruen* took pains to underscore the limits of the decision, including specifically with respect to felon-possession prohibitions. *See id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under *Heller* and *McDonald* (quotation marks and citations omitted)); *id.* at 2157 (Alito, J., concurring) (explaining

---

3    *See also, e.g.,* Colo. Rev. Stat. § 18-12-203(1)(c); Ga. Code Ann. § 16-11-129(b)(2)(B); Kan. Stat. Ann. §75-7c04(a)(2); La. Stat. Ann. § 40:1379.3(C)(6); Miss. Code Ann. § 45-9-101(2)(d); N.H. Rev. Stat. Ann. 159:6(I)(a); N.C. Gen. Stat § 14-415.12(b)(1); 18 Pa. Cons. Stat. § 6109(e)(1)(viii); Tex. Gov't Code Ann. § 411.172(a)(3) (West); W. Va. Code § 61-7-4(b)(5).

that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)).[4]

Because *Bruen*'s "holding decide[d] nothing about who may lawfully possess a firearm," *id.* at 2157 (Alito, J., concurring), the Supreme Court's decision plainly does not abrogate the above decisions recognizing that felons may be categorically prohibited from possessing firearms. In fact, multiple district courts have relied upon pre-*Bruen* precedent in rejecting post-*Bruen* challenges to Section 922(g)(1). *See, e.g., United States v. Riley,* --- F. Supp. 3d ----, 2022 WL 7610264, at *10 (E.D. Va. Oct. 13, 2022) (citing *Hamilton*, 848 F.3d 614, with approval and holding that *Moore*, 666 F.3d 313 remains controlling precedent); *United States v. Mosley*, No. 4:23-cr-0041-P, 2023 WL 2777473, at *2 (N.D. Tex. April 4, 2023) (concluding *Bruen* did not alter "fundamental premise" that "restrictions prohibiting convicted felons from possessing firearms do not violate the Second Amendment" and Fifth Circuit precedent—including *Scroggins*, 599 F.3d 433—remains binding); *United States v. Davis*, No. 1:21-cr-00206-ADA-BAM, 2023 WL 2505039, at *2-4 (E.D. Cal. March 24, 2023) (concluding *Bruen* "did not effectively overrule Ninth Circuit precedent upholding the validity of Section 922(g)(1),"

---

4 In total, eight members of the *Bruen* Court have joined at least one opinion expressly approving of *Heller*'s and *McDonald*'s reassurances regarding felon-dispossession statutes. The three dissenting justices agreed with Justice Kavanaugh's concurring opinion: "I understand the Court's opinion today to cast no doubt on [the] aspect of *Heller*'s holding" permitting prohibitions on felons possessing firearms. *Bruen*, 142 S. Ct. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting). Two years earlier, Justices Thomas and Gorsuch also agreed that *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).

including *Vongxay*, 594 F.3d 1111); *United States v. Baker*, No. 2:20-cr-301, 2022 WL 16855423, at *3 (D. Utah Nov. 10, 2022) (recognizing that nothing in *Bruen* "indicate[s] that either *Heller*, Tenth Circuit precedent based on *Heller*, or § 922(g)(1), are no longer valid"); *United States v. Kirby*, No. 3:22-cr-26-TJC-LLL, 2023 WL 1781685, at *3 (M.D. Fla. Feb. 6, 2023) (concluding *Rozier*, 598 F.3d 768, remains binding). Within the First Circuit, district courts have similarly concluded that *Torres-Rosario* remains binding precedent. *See United States v. Trinidad*, No. 21-398 (SCC), 2022 WL 10067519, at *1, 2 (D.P.R. Oct. 17, 2022) (*citing Eulitt v. Me. Dep't of Educ.,* 386 F.3d 344, 349 (1st Cir. 2004)); *accord United States v. Davis*, No. 1:23-cr-10018, Dkt. No. 49 (D. Mass. Mar. 17, 2023); *United States v. Belin*, No. 21-CR-10040-RWZ, 2023 WL 2354900, at *1 (D. Mass. Mar. 2, 2023).

*Bruen* did abrogate a separate aspect of the Second Amendment precedent from the First Circuit and several other circuits that has no bearing on the issue here. As *Bruen* explained, the courts of appeals had generally adopted a "two-step" Second Amendment framework, first ascertaining whether a law regulates activity falling within the scope of the constitutional right based on its original historical meaning, then applying a means-end scrutiny. 142 S. Ct. at 2126-27. *Bruen* held that, whereas "[s]tep one" is "broadly consistent with *Heller*," "*Heller* and *McDonald* do not support applying means-end scrutiny." *Id.* at 2127-30. That aspect of *Bruen*'s holding casts no doubt on the holdings in *Torres-Rosario, Hamilton, Moore, Scroggins, Vongxay, McCane,* and *Rozier*—among others, discussed above—which did not rely upon means-end scrutiny.

In *Hamilton* and *Moore*, for example, the Fourth Circuit did not reach the second, means-end scrutiny step. *See* 848 F.3d at 627-28; 666 F.3d at 319; *see also*

*Riley*, 2022 WL 7610264, at *10 (recognizing that *Moore* upheld Section 922(g)(1) relying on "historical foundations of the regulation and on *Heller*'s dicta" rather than "means-end analysis"). In *Scroggins*, the Fifth Circuit relied on pre-*Heller* precedent—in which it had already recognized an individual Second Amendment right—establishing that "criminal prohibitions on felons (violent or nonviolent) possessing firearm did not violate that right." 599 F.3d at 451 (citations omitted). Similarly, the Ninth Circuit looked to pre-*Heller* precedent, *Heller*'s admonition that it "should not be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons," and the Second Amendment's "explicit purpose" to conclude that "felons are categorically different from the individuals who have a fundamental right to bear arms . . . ." *Vongxay*, 594 F.3d at 1115-18.

The Tenth Circuit in *McCane* and the Eleventh Circuit in *Rozier* similarly did not rely upon means-end scrutiny. *McCane,* 573 F.3d at 1047 (relying on *Heller*'s explicit statements regarding felon-dispossession laws); *id.* at 1050 (Tymkovich, J., concurring) (reasoning that in light of *Heller*'s explicit approval, "we need not address the standard of review applicable to gun dispossession laws—strict scrutiny, intermediate, rational basis, or something else"—in resolving challenges to Section 922(g)(1)); *Rozier*, 598 F.3d at 770-71; *see also Heller*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (reasoning that "the Court in *Heller* affirmatively *approved* a slew of gun laws," including "felon-in-possession laws," "based on a history- and a tradition-based test," not based on means-end scrutiny) (emphasis in original).

*Bruen* did not call into question decisions by the Fourth, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits that Section 922(g)(1) is not susceptible to Second

Amendment challenges by convicted felons. Consistent with the First Circuit's skepticism and persuasive authority from the majority of circuits that have directly addressed this issue, this court should conclude that the Second Amendment is not susceptible to Levasseur's as-applied challenge.

### B. The Text Of The Second Amendment And Its Historical Context Make Plain That Levasseur, A Convicted Felon, Cannot Mount A Successful Attack On Section 922(g)(1).

Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses—a conclusion reached by the D.C. Circuit before *Bruen* as well as in a persuasive post-*Bruen* panel opinion of the Third Circuit. *See Medina*, 913 F.3d at 157-61 ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"— now abrogated—"step" of that court's pre-*Bruen* precedent); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) (holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses" can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"), *vacated upon granting of reh'g en banc,* No. 21-2835, 2023 WL 118469 (3d Cir. Jan 6,

2023).[5] In over 100 cases since *Bruen*, district courts have rejected Second Amendment challenges to Section 922(g)(1) based on text, history, precedent, or a combination of the three. As of the time of filing, the United States is not aware of any case in which a district court has held Section 922(g)(1) unconstitutional under *Bruen*.

Felon disarmament laws are consistent with the Second Amendment's text, as historically understood. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Felons do not fall within "the people" protected by the Second Amendment, and the "right . . . to keep and bear Arms" is not infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

The Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen,* 142 S. Ct. at 2314, who are "members of the political community," *Heller,* 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their

---

[5]     Though the panel opinion in *Range* has been vacated pending rehearing en banc, the opinion retains its persuasive value.

14

convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller,* 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercise[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48, 48 * (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteen century] and have remained so").

It remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160 (*citing* 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other rights belonging to members of the political community, Section 922(g)(1)

accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction," *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible." *Id.* (*quoting Heller*, 554 U.S. at 626); *see also, e.g., United States v. Carpio-Leon,* 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam); *Vongxay¸* 594 F.3d at 1118.

  *Heller* makes clear that the Second Amendment's protections are limited to those who are "members of the political community" and "law-abiding, responsible citizens." 554 U.S. at 580, 635; *see also, e.g., id.* at 644 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ., dissenting) (explaining that *Heller* "limits the protected class" in these ways). Multiple district courts—including two within the First Circuit—have agreed. *See, e.g., United States v. Wagoner*, No. 4:20-CR-00018, 2022 WL 17418000, at *5 (W.D. Va. Dec. 5, 2022) ("a plain reading of the text demonstrates that 'the people' remains limited to those within the political community and not those classified as felons" (*quoting Riley*, 2022 WL 7610264, at *10)); *Belin*, 2023 WL 2354900, at *1 ("the activity regulated by the felon in possession statute falls outside the scope of the Second Amendment's protections because it does not impact 'law-abiding, responsible citizens.'" (citations omitted)); *Davis*, No. 1:23-cr-10018, Dkt. No. 49 (acknowledging

16

that some courts interpret felons to be members of the "political community," but in accord with other courts, expressing that it is "doubtful that felons fall within the class of law-abiding citizens for Second Amendment protection."); *but see Trinidad*, 2022 WL 10067519, at *4 & n.4 (suggesting possibility that trial may be needed to resolve factual dispute under *Bruen* "step one" if defendant "said that he was possessing the firearms for a lawful purpose").

     *Bruen* makes particularly plain that those who are not law-abiding and responsible cannot successfully challenge laws that apply to them based on that status. As noted above, *Bruen* defined the Second Amendment right as belonging to "law-abiding" citizens on fourteen occasions. 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Id*. at 2134. In another passage, the Court approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. at 2138 n.9 (*quoting Heller*, 554 U.S. at 635). In another passage, the Court explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding* citizen's right to armed self-defense." *Id*. at 2133 (emphasis added). Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose any "burden" on "a law-abiding citizen's right to armed self-defense," *id*.

The Court's specific assurances regarding the permissibility of prohibitions on the possession of firearms by felons, *Heller,* 554 U.S. at 626-27, 627 n.26, 635, confirm that non-law-abiding citizens can be disarmed under a proper understanding of the constitutional text. In *Heller*, the Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights," *id.* at 635. Levasseur, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights," *id. See id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane"). Laws such as Section 922(g)(1) are therefore constitutional under the text of the Second Amendment as informed by a variety of "historical justifications," *id.* at 635.

## C. A Comprehensive Review of Historical Tradition Confirms Legislatures' Authority To Prohibit Felons From Possessing Firearms.

As the First Circuit has not yet expressly foreclosed the possibility of—or permitted—as-applied challenges to Section 922(g)(1), it has not established what facts a defendant must establish to prevail on such a claim.[6] In any event, a comprehensive review of "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, confirms the validity of laws disarming people because of felony convictions,

---

6        For example, pre-*Bruen*, the Third Circuit required a "challenger to . . . identify the traditional justifications for excluding from Second Amendment protections the class of which she appears to be a member, and then . . . present facts about herself and her background that distinguish her circumstances from those of persons in the historically barred class." *Folajtar*, 980 F.3d at 901 (citations and internal quotations and brackets omitted). If the challenger "distinguish[ed] herself from the historically barred class," the government bore the burden of establishing the statute survived means-end scrutiny. *Id.*

whether or not the felonies were violent. Levasseur cannot demonstrate facts or circumstances that set him apart from other felons prohibited by Section 922(g)(1) from possessing firearms.

Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures. *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies.

1. Firearm disqualification laws

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad authority to "categorically disqualif[y] people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range*, 53 F.4th at 274. Compelling evidence from the constitutional ratification debates confirms that, in light of this longstanding tradition of analogous regulation, the founders also understood that the precise type of regulation at issue in this case is constitutional: a legislature would not, in the founders' view, infringe the right to bear arms by "disarming the people . . . for crimes committed." *See infra* pp. 28-29 (quotation marks omitted) (discussing Pennsylvania Antifederalists' proposal in 1787).

a. *England*

19

Because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. In 1689, for example, the government passed an "Act for the better secureing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[7] Enacted shortly after the Glorious Revolution of 1688—when the Protestant King William and Queen Mary succeeded the Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith would have "disrespect for and disobedience to the Crown and English law." *Range*, 53 F.4th at 275. Far from "rest[ing] on the implausible premise that all Catholics were violent," *id.*, the statute made clear that its concern was with propensity to disobey the sovereign by providing that anyone who decided to make the

---

7    Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords 1685-1691*, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights [1688]*, https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that "[i]t appears that all the Acts of" the first Parliament of William and Mary "were treated as being Acts of 1688" in official sources under an "old method of reckoning"— including the English Bill of Rights, discussed below, which was similarly enacted in 1689).

declaration after having previously refused would regain the ability to keep and bear arms. 1 W. & M., Sess. 1, c. 15, *in* 6 *The Statutes of the Realm*, *supra*, at 72. This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (*quoting Heller*, 554 U.S. at 593). That predecessor specified that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c. 2, *in* 6 *The Statutes of the Realm* 143 (1688). "Englishmen had never before claimed the right of the individual to arms." *Bruen*, 142 S. Ct. at 2142 (alteration and quotation marks omitted). And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the members of that class had failed to demonstrate that they would abide by the law, whether or not they had previously exhibited violence.

### b. *Colonial America*

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy. Firearm regulations directed toward disarming Native Americans and Black people were pervasive.[8] These specific "status-based regulations of this period are repugnant (not to

---

8      *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006)*; see also, e.g., Laws and Ordinances of New Netherland, 1638-1674,* at 18-19 (1868) (1639 New Netherland law)*;* 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law)*;* 5 *Records Of The Colony Of New Plymouth* 173 (1856) (1675 Plymouth law)*;* 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law)*;* 2 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law)*; Grants, Concessions, and*

mention unconstitutional),” *Range*, 53 F.4th at 276 n.18, but “colonial history furnishes

numerous examples in which full-fledged members of the political community as it then

existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing

inadequate faithfulness to the sovereign and its laws,” *id.* at 276. Massachusetts, for

example, disarmed the supporters of an outspoken preacher in the 1630s “not because

those supporters had demonstrated a propensity for violence,” but because of their

“disavowal of the rule of law” and failure to demonstrate “obedience to the commands of

the government.” *Id.* (*first citing* Edmund S. Morgan, *The Case Against Anne*

*Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937); *then citing* Ann Fairfax

Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q.

226, 226 (1978); *then citing* James F. Cooper, Jr., *Anne Hutchinson and the “Lay*

*Rebellion” Against the Clergy*, 61 New Eng. Q. 381, 391 (1988); *and then citing* John

Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England*

*and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017)). To take

another example, during the French and Indian War, Virginia imported the English

tradition of disarming Catholics who refused to take a loyalty oath. *See* 7 *The Statutes at*

---

*Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law)*; 2 The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); *1 The Laws of Maryland, With The Charter, The Bill of Rights, The Constitution of The State, and Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments* 117-18 (1811) (1715 Md. Law)*; 6 The Public Records Of The Colony Of Connecticut* 381-82 (1872) (1723 Conn. law)*; Laws of New York From The Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law)*; A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law)*; 6 The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319- 20 (1899) (1763 Pa. law)*; Digest of the Laws of the State of Georgia From Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

*Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law). Like the English law discussed above, the Virginia statute tied disarmament to failure to take a loyalty oath—and exempted those who took the oath after previously refusing. *Id*. at 38.

      c.  *The Revolutionary War*

        Over the course of the Revolutionary War, American legislatures passed numerous laws "disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"—often specifically targeting those who failed to demonstrate loyalty to the emergent American government. *Range*, 53 F.4th at 277. An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231

(1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law).

The enacting legislatures, like their historical predecessors, made categorical judgments about disarmament that were not tied to an individual's past violent acts but rather to the legislature's judgment about who is included among the law-abiding, trustworthy members of the political community. A common feature of this set of laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. law at 479-80; 1776 R.I. law at 566-67; 1777 N.C. law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, to serve on juries, and to hold public office—further reinforcing the longstanding connection between arms-bearing and these related rights, *see supra* p. 17. *See, e.g.*, 1776 Mass. law at 481; 1777 N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.

A law like Connecticut's, disarming those who had libeled the government, certainly does not "narrowly target citizens who committed inherently violent or dangerous crimes." *Folajtar v. Attorney General*, 980 F.3d 897, 909 (3d Cir. 2020). The Pennsylvania law had the effect of depriving "sizable numbers of pacifists" of the right to bear arms "because oath-taking violated the religious convictions of Quakers,

Mennonites, Moravians, and other groups." *Range*, 53 F.4th at 278. That law is also particularly informative because the year before enacting it, Pennsylvania became one of the first states to adopt a state constitutional provision protecting an individual right to bear arms. *Heller*, 554 U.S. at 601; *see* Pa. Declaration of Rights of 1776 § XIII, *in The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins* 278 (Neil Cogan ed., Oxford University Press 2d ed., 2014); *see also* N.C. Declaration of Rights of 1776 § XVII, *in The Complete Bill of Rights*, *supra*, at 277-78 (individual rights-based constitutional provision adopted the year before the North Carolina disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII, *in The Complete Bill of Rights*, *supra*, at 277 (individual rights-based constitutional provision adopted four years after the Massachusetts disarmament law cited above). And the Virginia law required those who were disarmed to attend militia trainings and run drills without weapons—a consequence reinforcing the "social function" of publicly identifying those who were not "law-abiding members of the civic community," and a consequence that is not compatible with conceiving of those who were disarmed as "dangerous spies or threats of violence," *Range*, 53 F.4th at 279. *See* 1777 Va. law at 282 ("[T]he person so disarmed shall, nevertheless, be obliged to attend musters[] . . . .").

        In sum, the disarmament measures adopted during this early period of the Republic reflect that "legislatures were understood to have the authority and broad discretion to decide when disobedience with the law was sufficiently grave to exclude even a non-violent offender from the people entitled to keep and bear arms." *Range*, 53 F.4th at 279.

                d. *Ratification Debates*

25

The historical background of the Second Amendment's adoption provides particularly persuasive evidence that the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. One "Second Amendment precursor[]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). Though the proposal was not ultimately adopted in full, "it was due to the Federalists['] opposition to the Bill of Rights as a whole and not objections to these specific proposals." *United States v. Rice*, No. 3:22-CR-36 JD, 2023 WL 2560836, at *7 (N.D. Ind. March 17, 2023) (*citing United States v. Coombes*, 2022 WL 4367056, at *6 (N.D. Okla. Sept. 21, 22)).

Thus, the founding generation recognized that "crimes committed"—violent or not—can supply an independent ground for a legislature to prohibit firearm possession. As the D.C. Circuit explained, "[t]he use of the word 'or'" in th[e Pennsylvania] proposal reflects that "criminals, in addition to those who posed a 'real danger,'" have historically been "proper subjects of disarmament." *Medina*, 913 F.3d at 158-59.

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added) (quotation marks omitted). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals, like the Pennsylvania one, recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry—so the proposals cannot be "shoehorn[ed] . . . into the silo of dangerousness." *Folajtar*, 980 F.3d at 908-09. These proposals, like the Pennsylvania one, were cited favorably in the *Heller* Court's analysis of the Second Amendment as an individual right. *See Heller,* 554 U.S. at 604.

The Second Amendment as adopted does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including (but not necessarily limited to) "the felon," Cooley, *supra*, at 29, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that

27

was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (*quoting Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"). Given the language of these influential proposals along with the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *See Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record regarding "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

     e.  *Summary*

Each regulation discussed above demonstrates that the founders inherited a tradition under which a legislature has broad discretion to disarm classes of people they did not trust to follow the law. And collectively, the effect was that only a subset of the founding generation would have "fully enjoyed the right to keep and bear arms." Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 116 (2011) (explaining that the founders "were perfectly willing to confiscate weapons from anyone deemed untrustworthy").

     2.  <u>Felony punishment laws</u>

In a separate vein, for centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98. Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar*, 980 F.3d at 904-05. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (*quoting* Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also nonviolent conduct relating to forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's

29

estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few specific examples of state laws demonstrate the severe consequences of committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes including counterfeiting (as well as burglary, robbery, arson, and malicious maiming and wounding). 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law). The act established that every person convicted of such an offense was "liable to suffer death, shall forfeit to the people of this State, all his[] or her goods and chattels, and also all such lands, tenements, and hereditaments[] . . . at the time of any such offence committed, or at any time after." *Id.* at 666. For other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense . . . committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit. 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 260-61 (1886) (1786 N.Y. law). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and be committed to the [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261. In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which

the legislature believed previously "ha[d] not a punishment sufficiently exemplary

annexed thereto." 9 *The Statutes at Large; Being a Collection of All the Laws of*

*Virginia, from the First Session of the Legislature* 302 (1821) (1777 Va. forgery law).

The act stated that anyone convicted of forging, counterfeiting, or presenting for

payment a wide range of forged documents "shall be deemed and holden guilty of

felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at

the publick whipping post, thirty nine lashes, and shall serve on board some armed

vessel in the service of this commonwealth, without wages, for a term not exceeding

seven years." *Id.* at 302-03.[9] *See also, e.g.*, *A Digest of the Laws of Maryland* 255-56

(1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which

provided that those convicted "shall suffer death as a felon, without benefit of clergy").

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in

1791, would have understood someone facing death and estate forfeiture to be within the

scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *accord Range*, 53

F.4th at 280-81 ("*A fortiori*, given the draconian punishments that traditionally could be

imposed" for "non- violent" felonies including larceny, repeated forgery, and false

pretenses, "the comparatively lenient consequence of disarmament under 18 U.S.C. §

922(g)(1) is permissible."). The First Circuit has suggested, in dicta, that "the historical

---

9    The act provided that "the governour and council may make out of the offender's estate
such an allowance as they shall think necessary for the maintenance of his wife and children"
and, reflecting an American trend, provided that "no attainder for any offence hereby made
felony shall work any corruption of blood, or [disinheritance] of heirs." 1777 Va. forgery law
at 303; *see Wallach v. Van Riswick*, 92 U.S. 202, 210 (1875) (explaining that "[w]hen the Federal
Constitution was framed," corruption of blood "was felt to be a great hardship, and even rank
injustice").

pedigree of laws disarming those convicted of a crime is subject to substantial debate among scholars." *Booker*, 644 F.3d at 23 & n.3 (addressing challenge to Section 922(g)(9)). However, as demonstrated above, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160; *accord Belin*, 2023 WL 2354900, at *2.

    3.  Comparison to Section 922(g)(1)

Both sets of historical traditions surveyed above demonstrate Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. "[C]entral considerations" to analogical inquiry include whether the regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified . . . ." *Id.*

Of course, Section 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment. In any event, the burden imposed by disarmament on a felon's rights is comparable to historical laws disarming the untrustworthy and less severe than many historical laws punishing felonies, which often include the death penalty and forfeiture of one's estate.

The modern and historical laws are "comparably justified" as well. The historical record shows that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. History shows that legislatures' reasons for doing so could include a legislative judgment that the disarmed

persons could not be counted upon to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today.

    4.  <u>Levasseur's contrary arguments lack merit.</u>

Notwithstanding the federal statute's twentieth-century pedigree, felon-dispossession laws are themselves "longstanding" pillars of our Nation's legal system.[10] The Supreme Court has endorsed such laws as consistent with its text-and-history approach to the Second Amendment. *Heller*, 554 U.S. at 626.

The First Circuit assumed the possibility that the Supreme Court might "find some felonies so tame and technical as to be insufficient to justify the ban" and "possibly . . . might even be open to highly fact-specific objections," *Torres-Rosario*, 658 F.3d at 113, and has mused in dicta that Section 922(g)(1) "likely bears little resemblance to laws in effect at the time the Second Amendment was ratified," *Booker*, 644 F.3d at 23 & n.13, 24 & n.14. However, neither of those opinions nor *Bruen* support Levasseur's suggestion that the government "must prove that the Nation's history and tradition of firearms regulation as it existed in 1791 support the criminalization of possessing a firearm by a person with a history of non-violent criminal convictions." Dkt. 26 at 12. As

---

[10]    Section 922(g)(1) can be directly traced back to a 1938 statute prohibiting individuals convicted of a limited list of "crime[s] of violence" from shipping, transporting, or receiving firearms. *See* Federal Firearms Act, Pub. L. No. 75-785, secs. 1(6), 2(e)-(f), 52 Stat. 1250, 1250-51 (1938). In 1961, Congress expanded that law to cover felonies generally, regardless of violence. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, sec. 2, 75 Stat. 757, 757 (1961). In 1968, Congress prohibited possession, in addition to reenacting the prohibitions on shipment, transportation, and receipt. *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. VII, sec. 1202(a)(1), 82 Stat. 197, 236; *id.* at tit. IV, sec. 902, § 922(e)-(f), 82 Stat. at 230-31; *see also* Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, sec. 102, §§ 922(g)(1), 922(h)(1), 82 Stat. 1213, 1220 (reenacting and recodifying the prohibitions on shipping, transportation, and receipt); Firearms Owners' Protection Act, Pub. L. No. 99-308, secs. 102(6)(D), 104(b), 100 Stat. 449, 452, 459 (1986) (consolidating the prohibitions on shipping, transportation, possession, and receipt into 18 U.S.C. § 922(g)).

an initial matter, the First Circuit cautioned that such an as-applied challenge using such a fact-specific approach "applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." *Torres-Rosario*, 658 F.3d at 113.

More importantly, Levasseur misunderstands *Bruen*'s historical inquiry. Determining whether a regulation is consistent with the historical tradition of firearms regulation may require use of historical analogies to determine "whether the two regulations are 'relevantly similar.'" *Bruen,* 142 S. Ct. at 2132 (citation omitted). Thus, the government need not mine the history to identify a "historical *twin*" or "dead ringer" as a "historical precursor"—the government need only identify a "well-established and representative historical *analogue* . . . ." *Id.* at 2133. The lack of an identical historical statute does not suggest the founding generation would have viewed Section 922(g)(1) as violating the Second Amendment.

Nor does the lack of an identical historical offense suggest that Section 922(g)(1) is not analogous to the historical traditions discussed above. It would be "'absurd'" to interpret *Bruen* as "robotically . . . requir[ing] the Government in an as-applied challenge'" to Section 922(g)(1) "to find an analogy specific to the crime charged." *Range*, 53 F.4th at 285 (alteration omitted) (*quoting United States v. Charles*, No. 22-cr-154, --- F. Supp. 3d ----, 2022 WL 4913900, at *9 (W.D. Tex. Oct. 3, 2022)). As one district court applying *Bruen* has observed, "a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution." *United States*

34

*v. Kelly*, No. 3:22-cr-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022). To presume that founding era legislatures legislated to the full limits of their constitutional authority would mistakenly reduce "analogical reasoning under the Second Amendment" to the "regulatory straightjacket" that the Supreme Court forbids, *Bruen*, 142 S. Ct. at 2133. *See Kelly*, 2022 WL 17336578, at *2.

Here, Section 922(g)(1) is "analogous enough" to the array of English and early American historical precursors discussed above "to pass constitutional muster," *Bruen*, 142 S. Ct. at 2133. *See, e.g., Rice*, 2023 WL 2560836, at *8 (holding historical laws authorizing capital punishment and estate forfeiture upon felony conviction to be "sufficiently analogous"). Levasseur can be disarmed under *Bruen* because the law prohibiting him from possessing a firearm is part and parcel of a historical tradition of broad authority for a legislature to disarm categories of people who cannot be trusted to follow the law. That tradition encompasses the authority to impose severe consequences for felony convictions, including disarmament. *See Medina*, 913 F.3d at 158 ("[F]elonies were—and remain—the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" (*quoting Hamilton*, 848 F.3d at 626)); *see also id.* at 160 (rejecting as-applied challenge by someone "convicted of felony fraud—a serious crime, *malum in se*, that is punishable in every state"); *Folajtar*, 980 F.3d at 910-11 (rejecting as-applied challenge by person convicted of felony tax fraud, which "is no less serious than larceny, one of the nine common law felonies, or forgery, one of the first felonies in the United States" and which "reflects grave misjudgment").

Levasseur argues that as he "lacks a cranial history demonstrating any propensity for violence, he may not be stripped of his Second Amendment rights and prosecuted for

possessing a firearm simply due to his status as a felon." Dkt. 26 at 12. Levasseur's argument is at odds with the Supreme Court's recognition that Second Amendment rights belong to "law-abiding" citizens, and the Court's related express endorsement of felon-dispossession laws. *See Medina*, 93 F.3d at 159 ("[W]e see no reason to think that the Court meant 'dangerous individuals' when it used the word felon" in *Heller*.). The dangerousness argument also disregards the latitude historically accorded to legislatures to make categorical judgements regarding firearm disqualifications. While it may be possible to cobble together "cherry-picked history" suggesting that "dangerousness was one reason to restrict firearm possession," "it was hardly the only one." *Folajtar*, 980 F.3d at 909; *see also, e.g., Medina*, 913 F.3d at 158-59; *Rice*, 2023 WL 2560836, at *9 (concluding "use of . . . severe punishments on those convicted of violent and non-violent crimes shows that [defendant's] proposed distinction between violent and non-violent felonies is not supported by the historical record.")

Declining to adopt the historically unsupported dangerousness limitation also produces an outcome that, "[a]s a practical matter," "makes good sense." *Medina*, 913 F.3d at 159. If the constitutionality of felon-possession prohibitions were to turn on the "dangerousness" of the disqualifying offense, courts "would face the unenviable task of weighing the relative dangerousness of hundreds of offenses already deemed sufficiently serious to be classified as felonies." *Folajtar*, 980 F.3d at 906. If the relevant question were focused on the violence of the offense, that would "raise[] the question of *how violent*, exactly, a crime has to be for application of § 922(g)(1) to be constitutional." *Binderup v. Attorney General*, 836 F.3d 336, 410 (3d Cir. 2016) (Fuentes, J., joined by McKee, C.J., and Vanaskie, Shwartz, Krause, Restrepo, and Roth, JJ., concurring in

part, dissenting in part, and dissenting from the judgments), *abrogated on other grounds*, *Bruen*, 142 S. Ct. 2111; *cf. Johnson v. United States*, 576 U.S. 591, 598 (2015) (striking down Armed Career Criminal Act's residual clause, while citing the Court's "repeated attempts and repeated failures to craft a principled and objective standard" for defining what crimes qualify as violent). And if the analysis were to proceed as a case-by-case assessment of the danger posed by an individual felon, that would bear a striking resemblance to a process Congress already tried—before making a policy judgment to abandon it. *See Kanter*, 919 F.3d at 439, 450 (explaining that before 1992, 18 U.S.C. § 925(c) authorized the government to assess whether an individual applicant should be granted an exception from Section 922(g)(1), but that Congress "abandoned that approach after finding that the dangerousness inquiry was a 'very difficult' and time-intensive task, and that 'too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms.'" (citations omitted)); *see also United States v. Bean*, 537 U.S. 71, 77 (2002) (explaining that the now defunct process under Section 925(c) was "performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation").

Even if the relevant standard did account for whether a particular conviction demonstrates that the offender is violent, that would not help Levasseur here. As courts have recognized, empirically, convicted felons—including ones who committed offenses that do not involve violence—are more likely than ordinary, law-abiding citizens "to engage in illegal and violent gun use." *Kanter*, 919 F.3d at 448 (reviewing cases and studies) (quotation marks omitted). The First Circuit observed in *Torres-Rosario* that "[i]t is well-established that felons are more likely to commit violent crimes than are

other law-abiding citizens." 658 F.3d at 113 (*quoting United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011)). For example, the evidence reflects that fraud and forgery offenders commit future violent crimes at a significant rate, approaching the rate of future violent crimes by similarly situated individuals convicted of burglary and drug offenses. *Folajtar*, 980 F.3d at 909 (*citing* Matthew R. Durose, et al., Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010, Supplemental Tables: Most serious commitment offense and types of post-release arrest charges of prisoners released in 30 states in 2005*, at app. tbl.2 (Dec. 2016), https://bjs.ojp.gov/content/pub/pdf/rprts05p0510_st.pdf)). For decades, Congress has not deviated from its reasonable determination that felony convictions broadly, not just violent felonies, are disqualifying. *See, e.g.,* H.R. Rep. No. 87-1202, at 2 (1961) (touting the inclusion of felonies generally as "an integral part of an anticrime legislative program" that would respond to pressing "national concern" by "mak[ing] it more difficult for the criminal elements of our society to obtain firearms").

For these reasons, a review of historical tradition confirms legislatures' authority to prohibit felons—including Levasseur—from possessing firearms. Levasseur cannot set himself apart from other felons prohibited by Section 922(g)(1) from possessing firearms. His as-applied challenge to Section 922(g)(1) must fail.

**CONCLUSION**

For the foregoing reasons, Levasseur's Motion to Dismiss should be denied.

Dated: June 2, 2023                                    Respectfully submitted,

                                                       DARCIE N. MCELWEE
                                                       United States Attorney

                                    BY:     /s/ ANDREW MCCORMACK
                                            ANDREW MCCORMACK
                                            Assistant United States Attorney
                                            United States Attorney's Office
                                            202 Harlow Street, Suite 111
                                            Bangor, Maine  04401
                                            Tel:  207-945-0373
                                            Andrew.McCormack@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, I electronically filed the Government's Response in Opposition to Defendant's Motion to Dismiss Indictment with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Scott Hess, Esq., at scott@hesslawme.com
Counsel for Defendant

DARCIE N. MCELWEE
United States Attorney

BY:    /s/ Andrew McCormack
       Andrew McCormack
       Assistant United States Attorney
       United States Attorney's Office
       202 Harlow Street, Suite 111
       Bangor, Maine  04401
       Tel:  207-945-0373
       Andrew.McCormack@usdoj.gov

40